IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 11-00479-01 JMS |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANT |
| | ) | KENNETH SCOTT GORDON'S |
| vs. | ) | MOTIONS TO SUPPRESS |
| | ) | |
| KENNETH SCOTT GORDON (01), | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER DENYING DEFENDANT KENNETH SCOTT GORDON'S MOTIONS TO SUPPRESS

## I. INTRODUCTION

On May 18, 2011, Defendant Kenneth Scott Gordon ("Gordon") was indicted along with two co-Defendants for conspiracy to distribute, and possession with intent to distribute, methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1), & 841(b)(1)(A). Gordon now moves to suppress evidence seized from a black bag he was carrying when he was arrested on May 14, 2011, and from a wallet and a cellular telephone found on him at that time. In Gordon's Motion to Suppress No. 1, Doc. No. 74, and Motion to Suppress No. 2, Doc. No. 75, ("the Motions") he argues that the warrantless searches of the three items violated the Fourth Amendment.

The court held an evidentiary hearing on the Motions on August 6,

2012.  Supplemental briefing by both parties was filed on August 24, 2012, Doc.

Nos. 99 & 100, and on September 5, 2012 by Gordon.  Doc. No. 103.  The court

has considered the supporting, opposing, and supplemental memoranda; the

arguments of counsel; the evidence admitted into the record; and the credibility of

the witnesses testifying at the hearing.  Based on the following, the court finds and

concludes that the searches of the black bag, the wallet, and the cellular telephone

were reasonable under the Fourth Amendment and were constitutional under the

search-incident-to-arrest exception to the Fourth Amendment's warrant

requirement.  Accordingly, the Motions are DENIED.

## II.  FACTUAL BACKGROUND

Four witnesses testified at the August 6, 2012 hearing:  Drug

Enforcement Agency ("DEA") Special Agents Matthew Rumschlag ("Agent

Rumschlag") and Clement Sze ("Agent Sze"), and Honolulu Police Department

("HPD") Officers Donald Marumoto ("Officer Marumoto") and Len Fujinaka

("Officer Fujinaka").  The parties also stipulated to facts regarding a wallet taken

"from the person" of Gordon, and of the wallet's contents.  *See* Doc. No. 96, Stip.

re. Motion No. 1 & Ex. S-1.  The court also received nine exhibits into evidence.

Although the testimony of witnesses differed in some aspects, the

witnesses generally agreed on those facts, set forth below, which are most crucial

to determining whether the searches were valid. In particular, in carefully assessing the testimony of each witness, including their demeanor and manner of testifying, the court finds Agent Rumschlag's testimony -- as supported by certain testimony of other witnesses -- to be credible and consistent with the other evidence in the record as to key details. The court also finds the testimony of Agent Sze credible as to his search of the cellular telephone. Based upon its review of the evidence and testimony presented at the hearing, the court finds the following facts by a preponderance of the evidence. *See United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987) ("The government must prove the existence of an exception to the Fourth Amendment Warrant Requirement by a preponderance of the evidence.") (citations omitted).

## A.    The Surveillance Operation

Gordon was arrested on May 14, 2011 and subsequently charged for his role as a courier of drug money. Cooperating co-Defendant Richelle Higa ("Higa") had been arrested the day before, having been found in possession of approximately four pounds of methamphetamine. Higa told DEA agents that couriers picked up money from her -- hidden in boxes of macadamia nut candy -- as payment for narcotics that she had received from co-Defendant Tyrone Fair. Couriers would come to her residence to pick up boxes and fly them to the

mainland for delivery. A courier was scheduled to arrive at Higa's residence in the Pearl City area of Oahu at approximately 10:30 a.m. on May 14, 2011 to pick up money. Thus, law enforcement officials established a surveillance operation and placed macadamia nut candy boxes (filled with paper intended to simulate currency) inside Higa's apartment. Surveillance was set up both inside and outside the apartment, with cameras videotaping what was happening inside.

At approximately 10:24 a.m. on May 14, 2011, officers observed Gordon arrive at Higa's apartment complex and park his vehicle. Carrying a black duffel bag, Gordon entered Higa's apartment and stayed for approximately thirty seconds. Inside, law enforcement officials witnessed and videotaped Gordon enter the apartment, take the candy boxes, and place them in his black bag. Gordon then left the residence with his bag hanging by a strap from his shoulder. Agent Sze (who was waiting in the lobby of the apartment complex) followed Gordon out of the complex, staying several feet behind him. As Gordon approached his vehicle, Officers Marumoto and Fujinaka, and two other HPD Officers, detained him. Officer Marumoto grabbed Gordon's right arm and another officer grabbed the left arm. Agent Rumschlag, who had been around the corner monitoring the situation, then arrived on scene.

**B.    The Black Bag**

As the Officers detained Gordon, the black bag was removed from Gordon's shoulder and Gordon was handcuffed.  It is unclear who removed the bag -- Agent Rumschlag testified that "I believe I seized the bag or one of the officers that were in the area," while Agent Sze recalls seeing Officer Marumoto taking it from Gordon's shoulder.  Regardless, Agent Rumschlag testified credibly that, after Gordon was arrested and placed in handcuffs, he immediately placed the bag on the ground and opened it.  He immediately looked inside (as he had been trained to do), confirmed that the macadamia nut boxes that agents had placed in Higa's apartment were in the bag, and saw other boxes and some souvenir items.  Agent Sze, Officer Marumoto, and Officer Fujinaka confirmed that Gordon was carrying a black bag on one of his shoulders when he was detained.  Shortly after his arrest, Gordon was taken to a law enforcement van that was parked near Gordon's vehicle.

As for timing, the removal of the bag from Gordon, the arrest and handcuffing, and the search of the bag occurred contemporaneously -- according to Agent Rumschlag, they occurred "almost instantaneously."  Agent Rumschlag testified consistently and credibly that Gordon had the bag on his shoulder when he was detained, that the bag was taken, and that an initial search occurred at the

scene as Gordon was being handcuffed or shortly thereafter.[1]  That is, Agent

Rumschlag opened the bag very close to the time of his arrest, within "a matter of

seconds."  Officer Marumoto confirmed that Gordon was placed under arrest

maybe a "couple seconds after" Gordon was stopped and that Agent Rumschlag

was "dealing with a bag" at that time.

As for proximity, the bag was within Gordon's reaching distance at

the time -- Agent Rumschlag credibly testified that the bag was "right behind

where Mr. Gordon was standing" and "he was standing right near me."  The court

specifically asked Agent Rumschlag if Gordon was right in front of the bag when

he looked inside and he answered that Gordon "was within distance of the bag."

The Government does not dispute that Gordon was under the custody

and control of law enforcement when Agent Rumschlag initially searched the bag.

Gordon offered no resistance to the arrest, and was surrounded by several officers.

The testifying witnesses did not observe any other persons at the scene that they

deemed to be potential threats.  Weapons were neither observed at the scene nor

---

[1]  On cross-examination, Agent Rumschlag admitted that he failed to memorialize his initial search of the bag in his written report.  *See* Doc. No. 93-1, Def.'s Ex. A.  Having reviewed the written report and carefully observing Agent Rumschlag's testimony, the court concludes that this omission from the written report does not undermine Agent Rumschlag's credibility. That is, the court finds that, as he testified, Agent Rumschlag placed the bag on the ground and conducted a cursory search "almost instantaneously" with Gordon being arrested and handcuffed.

found in the bag.

After Agent Rumschlag made his initial search of the bag, it was transported by law enforcement, along with Gordon, to the DEA office at the PJKK Federal Building ("the Federal Building") in Honolulu. The Federal Building is an approximately twenty or thirty minute drive from where the arrest took place. Agent Rumschlag returned to the Federal Building at the same time. It is unclear exactly how the bag was taken to the Federal Building (Agent Sze recalls the bag being transported by Officer Marumoto and HPD Officers in the van, although Officer Marumoto testified that he did not see the bag again after it was turned over to federal agents). It is undisputed, however, that the bag remained in the complete control of law enforcement from when it was removed from Gordon's shoulder at the scene of the arrest until it arrived at the Federal Building.

Shortly after arriving at the Federal Building, Agent Rumschlag opened the bag and conducted a more thorough search of its contents. This involved removing all of the items from the bag and completing an inventory of those items. Agents found the macadamia nut candy boxes that they had planted (*i.e.*, the boxes containing paper to simulate the weight of currency). They also found other boxes of a different brand of macadamia nut candy, which they had not planted, containing bundles of United States currency.

Agent Rumschlag and Special Agent Joe Cheng took photographs of the bag and its contents at the DEA office. Government Exhibit 2B is a photograph of at least nine bundles of $20 and $100 bills found inside the opened candy boxes. The first of these photographs contains a time stamp which indicates that it was taken at 11:24 a.m., approximately one hour after Gordon was arrested. Although the authenticity of the time stamp was not established, the 11:24 a.m. time stamp is consistent with other evidence indicating that the photographs were taken approximately one hour after the initial arrest.

## C.    The Wallet

When Gordon was detained and arrested, law enforcement removed his wallet from him. The wallet was later searched at the DEA office at the Federal Building and found to contain a Hawaiian Airlines boarding pass in Gordon's name for a 1:00 p.m. flight that day (May 14, 2011) from Honolulu to Oakland, California. For purposes of these Motions, the parties have agreed to the following stipulated facts:

> The parties agree and stipulate that, if called, law enforcement witnesses would testify that a wallet was taken from the person of Defendant Gordon at the time of his arrest on May 14, 2011, and remained in the custody of law enforcement agents thereafter. The parties further stipulate that the wallet was transported along with the defendant back to the DEA Offices, where it was first searched by DEA agent Matt Rumschlag and Task Force

Agent Burt Akana.  A Hawaiian Airlines Boarding Pass, a copy of which is attached hereto, marked as Exhibit S-1, was found during a search of the wallet at the DEA offices.  The Hawaiian Airlines boarding pass is in Gordon's name, and is for a flight to Oakland scheduled to depart from Honolulu at 1:00 p.m. on the day of the arrest.

Doc. No. 96, Stipulation; Doc. No. 96-1, Ex. S-1 (boarding pass).

## D.    The Cellular Telephone

Law enforcement officials also recovered a cellular telephone from Gordon when he was arrested on May 14, 2011.  Agent Sze testified credibly that he followed Gordon as he left Higa's residence and walked towards Gordon's vehicle.  After Officer Marumoto and other HPD Officers detained and arrested Gordon, Agent Sze was given Gordon's cellular telephone, which he examined "right then and there."  Agent Sze testified that immediately after receiving the cellular telephone, he looked at its recent-call list and contact list.  He testified that he was investigating whether Gordon was supposed to meet with somebody right away or who else was calling him who might be involved -- that is, he was looking for evidence of the crime for which Gordon was arrested.

There was conflicting testimony as to who removed the cellular telephone from Gordon.  Agent Sze recalls that Officer Marumoto took the telephone from Gordon's pocket and handed it to him.  Agent Sze testified that,

after he examined its call and contact lists, he gave it back to Officer Marumoto for transportation with Gordon to the Federal Building. Officer Marumoto testified that the telephone was taken from Gordon while patting him down during the arrest, but he recalls Officer Fujinaka removing it and turning it over to an agent. Officer Marumoto does not recall seeing the telephone again or transporting it to the Federal Building. Officer Fujinaka, however, recalls the telephone being removed from Gordon but does not remember who removed it (and testified he did not remove the telephone), although he confirms that the telephone was transported in the van with Gordon to the Federal Building.

Despite the discrepancies, it is undisputed that the cellular telephone depicted in Government Exhibit Three was removed from Gordon's person -- it was most likely taken from his pocket as he was being patted down while detained and handcuffed by HPD Officers. It is also established by Agent Sze's credible testimony that Agent Sze examined the telephone's contact and recent call lists at the scene. Agent Sze also indicated that, at some point, the telephone rang (although he did not indicate whether it was answered). Agent Rumschlag testified consistently that "another agent looked at the cell phone at the scene" and that it was "chirping." It is also established that the telephone was at all times in custody of law enforcement after it was removed from Gordon and taken to the Federal

Building.

Within about a half hour after returning to their office, Agents Rumschlag and Sze (and possibly Agent Cheng) took photographs of the telephone and of its call log (or list of recent calls) and its contact list. The photographs taken reflect the same information Agent Sze reviewed at the scene of Gordon's arrest. That is, agents brought up the call log and contact list on screen and took "screen shots" so as to preserve the contents.

## III. DISCUSSION

The parties do not dispute that probable cause existed to arrest Gordon on May 14, 2011.[2] Gordon argues, however, that the court should suppress the evidence seized during the arrest from the black bag, the wallet, and the cellular telephone because the seizures and subsequent warrantless searches of the items violated his Fourth Amendment rights. In response, the United States asserts that the searches were valid as being incident to Gordon's lawful arrest. The court first sets forth general legal principles and then addresses each item in turn.

---

[2] And, in fact, there was ample probable cause to arrest Gordon. Law enforcement had specific information from Higa that a courier for drug money would arrive precisely when Gordon arrived, and agents saw and videotaped Gordon enter Higa's apartment and take the macadamia nut candy boxes just as Higa had described. *See, e.g.*, *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010) ("In determining whether there was probable cause to arrest, we look to the totality of circumstances known to the arresting officers, to determine if a prudent person would have concluded there was a fair probability that the defendant had committed a crime.") (citation and internal editorial marks omitted).

**A.     The Fourth Amendment and the Search-Incident-to-Arrest Doctrine**

"'The Fourth Amendment prohibits unreasonable searches and seizures by the Government[.]'" *United States v. Valdes-Vega*, 685 F.3d 1138, 1143 (9th Cir. 2012) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "Warrantless searches by law enforcement officers 'are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'" *United States v. Cervantes*, 678 F.3d 798, 802 (9th Cir. 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "Among the exceptions to the warrant requirement is a search incident to a lawful arrest." *Arizona v. Gant*, 556 U.S. 332, 338 (2009).

This "search-incident-to-arrest doctrine" permits "a police officer who makes a lawful arrest [to] conduct a warrantless search of the arrestee's person and the area 'within his immediate control.'" *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419, 2424 (2011) (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)).

> This general exception has historically been formulated into two distinct propositions. The first is that a search may be made of the person of the arrestee by virtue of the lawful arrest. The second is that a search may be made of the area within the control of the arrestee.

*United States v. Robinson*, 414 U.S. 218, 224 (1973). And different rules apply to a search "of the person" and a search of "the area within the control of the

arrestee."  The court addresses each separately.

### 1. Searches of "the person"

"[U]nder *Robinson* and its progeny, when law enforcement officers discover a personal effect on that person, the officers may search that item[.]" *United States v. Cook*, 2011 WL 6748517, at *5 (N.D. Cal. Dec. 22, 2011).  In that situation, "the propriety of the search 'does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect.'"  *Id.* (quoting *Robinson*, 414 U.S. at 236).  Thus, "'in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.'"  *United States v. Ruckes*, 586 F.3d 713, 717 (9th Cir. 2009) (quoting *Robinson*, 414 U.S. at 235).

Moreover, "searches and seizures [of the person] that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention."  *United States v. Edwards*, 415 U.S. 800, 803 (1974).  "[O]nce a person is lawfully seized and placed under arrest, she has a reduced expectation of privacy in her person."  *United States v. Monclavo-Cruz*, 662 F.2d 1285, 1290 (9th Cir. 1981).  And so, for example,

> a search of a cigarette case on the person is lawful once the
> person is under arrest without reference to any possible danger
> to the police, and the search of a person's clothes taken from
> him at the jail the day after his arrest is also lawful simply as
> reasonable jailhouse procedure.

*Id.* (citing *Robinson* and *Edwards*). *See, e.g.*, *United States v. Passaro*, 624 F.2d 938, 943 (9th Cir. 1980) (upholding search of wallet taken from suspect's person as a search incident to arrest); *United States v. Ziller*, 623 F.2d 562, 563 (9th Cir. 1980) (same).

### 2.    Searches of "the area within the control of the arrestee"

On the other hand, "[u]nlike searches of the person, searches of possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by the arrest." *United States v. Chadwick*, 433 U.S. 1, 16 n.10 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1982). Rather, such warrantless searches are "conducted for the twin purposes of finding weapons the arrestee might use, or evidence the arrestee might conceal or destroy." *United States v. Maddox*, 614 F.3d 1046, 1048 (9th Cir. 2010) (citing *Chimel*, 395 U.S. at 762-63); *Cf. Gant*, 556 U.S. at 351 (concluding, in a vehicle-search context, that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle

contains evidence of the offense of arrest.").

As to a search within an arrestee's area of immediate control, "[t]he critical inquiry . . . is whether the search is 'roughly contemporaneous with the arrest.'" *United States v. Smith*, 389 F.3d 944, 951 (9th Cir. 2004) (per curiam) (quoting *United States v. McLaughlin*, 170 F.3d 889, 892 (9th Cir. 1999)). "[T]he relevant focus is 'not strictly on the timing of the search but its relationship to (and reasonableness in light of) the circumstances of the arrest.'" *United States v. Caseres*, 533 F.3d 1064, 1073 (9th Cir. 2008) (quoting *Smith*, 389 F.3d at 951). "A search incident to arrest need not be delayed until the arrest is effected. Rather, when an arrest follows 'quickly on the heels' of the search, it is not particularly important that the search preceded the arrest rather than vice versa." *Smith*, 389 F.3d at 951 (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980)). Thus, "the determination of the validity of a search incident to arrest in this circuit is a two-fold inquiry: (1) was the searched item within the arrestee's immediate control when he was arrested; (2) did events occurring after the arrest but before the search ma[k]e the search unreasonable?" *Maddox*, 614 F.3d at 1048 (quoting *United States v. Turner*, 926 F.2d 883, 887 (9th Cir. 1991)) (the "*Turner* factors").

The *Turner* factors must be applied with the underpinnings of the search-incident-to-arrest doctrine in mind. In 2009, the Supreme Court, although

addressing a vehicle search, emphasized the justifications underlying "the *Chimel* exception" to the Fourth Amendment's warrant requirement. *Gant*, 556 U.S. at 343. The defendant in *Gant* was arrested for driving with a suspended license, and then handcuffed and placed in the back of a police patrol car. Police then returned to the defendant's car, searched it, and discovered a gun and cocaine hidden in the pocket of a jacket found in the back seat. In concluding that the search was unreasonable, *Gant* tethered the legality of a search incident to arrest to the *Chimel* justifications: officer safety and preservation of evidence. *See id*. "[I]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." *Id.* at 339. That is, *Gant* "refocus[ed] . . . attention on a suspect's ability (or inability) to access weapons or destroy evidence at the time a search incident to arrest is conducted." *United States v. Shakir*, 616 F.3d 315, 318 (3d Cir.), *cert. denied*, 131 S. Ct. 841 (2010).

Given these general principles, the court turns to analyzing the searches of the challenged items.

///

///

///

**B.     Application to Gordon's Black Bag**

Applying the *Turner* factors set forth in *Maddox*, the court upholds the search of the black bag as a valid warrantless search.[3]  The court thus does not suppress the items taken from the bag (the different macadamia nut candy boxes and the currency found inside several boxes).

First, the bag was certainly within Gordon's "immediate control" when he was detained and arrested.  *Maddox*, 614 F.3d at 1048 (setting forth the test's first prong: "was the searched item within the arrestee's immediate control when he was arrested[?]").  It is undisputed that the bag was hanging from Gordon's shoulder when HPD Officers and Agent Sze detained him outside Higa's apartment complex.  After the bag was removed from Gordon, Agent Rumschlag contemporaneously made an initial, although perhaps cursory, search of the bag.  He confirmed that the bag contained the candy boxes, and saw other potential

_____

[3]  *Maddox* -- decided over a year after *Gant* -- reaffirmed the *Turner* analysis, which was applied in *United States v. Nohara*, 3 F.3d 1239 (9th Cir. 1993), in upholding a search of a bag while the suspect was handcuffed.  *See Nohara* at 1243 (stating the "test for a valid search incident to arrest [as]: 1) the area searched must be that area under the arrestee's immediate control when he was arrested, and 2) events between the time of the arrest and search must not render the search unreasonable").  This court thus cannot conclude that *Gant* overruled Ninth Circuit caselaw such as *Nohara*, *Passaro* (upholding search of wallet taken from person), and *Ziller* (same) -- upon which the Government relies heavily.  *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc) (holding that only when "the reasoning or theory of . . . prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, [should a court] consider itself bound by the later and controlling authority, and . . . reject the prior circuit opinion as having been effectively overruled.").  *Nohara*, *Passaro*, and *Ziller*, are not "clearly irreconcilable" with *Gant*.

evidence of the crime.  Even if Gordon was under control of law enforcement officers, and even if he was immediately handcuffed, the bag was next to or near Gordon when Agent Rumschlag observed its contents.

Second, no intervening events occurred between when Gordon was detained and arrested and when Agent Rumschlag initially searched the bag. Agent Rumschlag opened the bag immediately, within "a matter of seconds."  The initial search was "roughly contemporaneous with the arrest."  *Smith*, 389 F.3d at 951.  The arrest and search occurred in "one continuous series of events closely connected in time."  *Id.* (quoting *United States v. McLaughlin*, 170 F.3d 889, 893 (9th Cir. 1999)).  That is, the arrest and search were not "so separated in time or by intervening acts that the latter cannot be said to have been incident to the former." *United States v. Weaver*, 433 F.3d 1104, 1106 (9th Cir. 2006) (quoting *McLaughlin*, 170 F.3d at 893).  Indeed, where Gordon's arrest followed "quickly on the heels" of the search (or vice versa), the precise order "is not particularly important."  *Smith*, 389 F.3d at 951 (citing *Rawlings*, 448 U.S. at 111).

Moreover, the search of the bag was consistent with the twin justifications underlying this "*Chimel* exception," as reiterated in *Gant*.  The bag could have contained weapons, and it could have (and did) contain evidence of the crime for which Gordon was detained and arrested -- evidence that Agent

Rumschlag would need to preserve and which Gordon could conceivably have affected or destroyed as he was being detained and arrested (although perhaps destruction was unlikely after he had been secured and handcuffed).

In this regard, Government witnesses conceded that Gordon was under the custody and control of law enforcement when Agent Rumschlag searched the bag. Under *Gant*, "whether a suspect is 'secured' is an important consideration in assessing the lawfulness of a warrantless search." *Shakir*, 616 F.3d at 319. But the court does not read *Gant* as establishing a bright-line rule that the search-incident-to-arrest exception cannot apply once a suspect is handcuffed. That is, even if Gordon was handcuffed shortly *before* Agent Rumschlag actually made his initial search of the bag, the court still upholds the search as incident to his arrest. The court agrees that

> if *Gant* is construed to forbid all container searches after a suspect is handcuffed or held by police, it would . . . effectively eliminate a major element of the search-incident-to-arrest doctrine. In *Chimel*, the Supreme Court stated that searches of "the arrestee's person" and "the area into which an arrestee might reach" could be aimed at finding weapons the arrestee might use to "effect his escape." 395 U.S. at 763. The Court thus contemplated that such searches would take place after the suspect is restrained in some way. To hold that a container search incident to arrest may not occur once the suspect is under the control of the police, but before he has been moved away from the item to be searched, would eviscerate this portion of *Chimel*.

*Gant* did not purport to do any such thing.

*Id.* at 320.[4]

Further, as noted earlier, *Gant* is not "clearly irreconcilable" with Ninth Circuit caselaw such as *United States v. Nohara*, which upheld the search of a bag while a suspect was handcuffed based on the search-incident-to-arrest doctrine. *Nohara*, 3 F.3d at 1243; *see also, e.g.*, *Cook*, 2011 WL 6748517, at *5 (citing several unpublished Ninth Circuit decisions upholding similar searches of bags and backpacks). *Nohara* remains binding on this court. Indeed, even after *Gant*, courts continue to follow *Nohara* and similar caselaw involving handcuffed suspects. *See Cook*, 2011 WL 6748517, at *5-6; *United States v. Kowalczyk*, 2012 WL 3201975, at *17 (D. Or. Aug. 3, 2012) ("I find the search incident to arrest [of luggage] was valid even though Kowalczyk was handcuffed and removed from the

_____

[4] *Gant* arose out of the search of a vehicle, and some courts have limited its holding to that vehicular context. *See, e.g.*, *United States v. Bowman*, 2010 WL 749908, at *4 (M.D. Ala. Mar. 4, 2010) ("The holding in *Gant* is limited to searches of vehicles and has not been extended to other searches incident to an arrest.");*United States v. Perdoma*, 621 F.3d 745, 751 (8th Cir. 2010) (stating that although the "explanation in *Gant* of the rationale for searches incident to arrest may prove to be instructive outside the vehicle-search context in some cases," it was not useful in determining the lawfulness of a warrantless search of a bag). Other courts, however, have reasoned that *Gant*'s principles apply more generally to searches outside the vehicular-search context. *See, e.g.*, *United States v. Taylor*, 656 F. Supp. 2d 998, 1001-02 (E.D. Mo. 2009) ("The Court is not persuaded that *Gant* should be limited to the automobile context."); *Shakir*, 616 F.3d at 318 (applying the *Gant* standard to a warrantless search of a bag while a suspect was handcuffed). The court need not resolve whether *Gant* is limited specifically to vehicular searches, because here the search of Gordon's bag was lawful whether or not *Gant*'s reasoning applies.

immediate area.") (citations omitted); *Shakir*, 616 F.3d at 320-21 ("[R]eading *Gant* to prohibit a search incident to arrest whenever an arrestee is handcuffed would expose police to an unreasonable risk of harm."). Thus, even if Gordon was handcuffed, under the totality of circumstances in this case, the search of Gordon's bag was valid.

It follows that -- as Gordon conceded at the August 6, 2012 hearing -- because law enforcement maintained uninterrupted possession and control of the bag after it was initially searched at the scene, the subsequent more thorough search at the Federal Building was also valid. *See United States v. Burnette*, 698 F.2d 1038, 1049 (9th Cir. 1983) ("[W]e hold that once an item in an individual's possession has been lawfully seized and searched, subsequent searches of that item, so long as it remains in the legitimate uninterrupted possession of the police, may be conducted without a warrant."). That is, Gordon agreed at the hearing that if the court upholds Agent Rumschlag's initial search of the bag, then the subsequent search at the Federal Building would be valid. The Government has thus proven that the items taken from the searches of Gordon's bag resulted from lawful warrantless searches incident to his arrest.[5]

---

[5] In any event, because *Nohara* has not been overruled, suppression of the evidence in the bag would not be warranted even if the court found the search improper. That is, assuming that a warrant was required before Agent Rumschlag searched the bag because Gordon was

(continued...)

## C. Application to Gordon's Wallet

The parties stipulated that Gordon's wallet was "taken from [his] person" when he was arrested, and that it remained in custody of law enforcement until it was initially searched at the Federal Building. Relying on *Monclavo-Cruz*, Gordon argues that evidence taken from the search of the wallet (*i.e.*, the Hawaiian Airlines boarding pass) should be suppressed because a search of the wallet did not occur at the scene of the arrest. Rather, it occurred at the Federal Building -- a twenty to thirty minute drive from the scene -- and about an hour after the wallet was taken from Gordon's person. The court disagrees.

Although Gordon's wallet was searched at the Federal Building after Gordon was taken there, it was contemporaneously removed from his person as he was being detained and arrested. And this is a key fact -- because the wallet was taken from his "person," it was a reasonable search and falls squarely within the search incident to arrest exception. "Under *Robinson* and its progeny, when law

---

[5](...continued)
handcuffed, exclusion of the evidence would not be an appropriate remedy. Given existing Ninth Circuit precedent, Agent Rumschlag's search was objectively reasonable. *See, e.g.*, *United States v. Leon*, --- F. Supp. 2d ----, 2012 WL 1081962, at *3 (D. Haw. Mar. 28, 2012) ('[T]he exclusionary rule [does] not apply when police 'conduct a search in objectively reasonable reliance on binding appellate precedent[.]'") (quoting *Davis v. United States*, 131 S. Ct. 2419, 2428 (2011)). Gordon argues that good faith reliance on *Nohara* is inappropriate because it predates *Gant* and *Maddox*. But, as noted earlier, *Maddox* reiterated and applied the same *Turner* factors that *Nohara* applied. *Gant*, *Maddox,* and *Nohara* are not "clearly irreconcilable," *Miller*, 335 F.3d at 893, and thus the court continues to consider *Nohara* as valid precedent. The good faith exception applies.

enforcement officers discover a personal effect on that person, the officers may search that item," *Cook*, 2011 WL 6748517, at *5, and "a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *Robinson*, 414 U.S. at 235. With items taken from a suspect's person, "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." *Edwards*, 415 U.S. at 803. Although *Monclavo-Cruz* invalidated a search of a purse found on a suspect's lap, it distinguished that situation from one where a wallet was found on a suspect's "person" -- indicating that such a search of a wallet is valid under the search incident to arrest doctrine. *Monclavo-Cruz*, 662 F.2d at 1290; *see also Maddox*, 614 F.3d at 1048 (reasoning that "this was *not* a search of Maddox's person incident to arrest" when invalidating a search of a key chain).[6]

Based on this rationale (allowing searches of items associated with

---

[6] In *Chadwick*, the Supreme Court suppressed the search of a footlocker that was seized at the time of arrest, but not searched until approximately an hour later. 433 U.S. at 15. It reasoned:

> Once law enforcement officers have reduced luggage or other personal property *not immediately associated with the person* of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

*Id.* (emphasis added). Its reasoning thus distinguishes searches of items like a wallet "immediately associated with the person."

"the person"), binding Ninth Circuit precedent has specifically upheld searches of wallets -- found on suspects as they were being detained and arrested -- as lawful warrantless searches incident to arrest. *See Passaro*, 624 F.2d at 944 ("Unlike a double-locked footlocker, which is clearly separate from the person of the arrestee, the wallet found in the pocket of Mr. Passaro was an element of his clothing, his person, which is, for a reasonable time following a legal arrest, taken out of the realm of protection from police interest."); *Ziller*, 623 F.2d at 563 ("[A] search of the contents of the wallet is likewise permissible as being an incident to and part of a personal search."); *Monclavo-Cruz*, 662 F.2d at 1290 (reiterating that "[the Ninth Circuit] approved the warrantless search of an arrested person's wallet taken from his person [in *Passaro* and *Ziller*]" and finding it "significant that the *Passaro* court characterized the wallet of the arrested person as an 'element of his clothing.'").[7] *Gant*, which did not analyze a search of an arrestee's person, does

---

[7] Gordon argues that the rule reiterated in *Monclavo-Cruz* is restricted to a search of a wallet taken from a suspect *while being booked* (not taken earlier while being detained and arrested). There is, however, no meaningful distinction between (1) a search of the wallet held in uninterrupted police custody that could have been searched at the scene when taken, and (2) a search of a wallet taken from the suspect when being booked. *See Edwards*, 414 U.S. at 806 ("[I]t is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest."); *cf. United States v. Murphy*, 552 F.3d 405, 412 (4th Cir. 2009) (upholding search of cell phone taken from person and later searched at a DEA headquarters, reasoning in part that "once the cell phone was held for evidence, other officers and investigators were entitled to conduct a further review of its contents . . . without seeking a warrant") (citing *Edwards*, 415 U.S. at 803-04).

(continued...)

nothing to change this binding circuit precedent regarding searches of wallets found on a suspect. *Cf. United States v. Gomez*, 807 F. Supp. 2d 1134, 1143 (S.D. Fla. 2011) ("While *Gant* signaled a retraction from the ever-expanding line of [*New York v.*] *Belton*[, 454 U.S. 454 (1981)] cases in the vehicle context, it is still well established that any objects found on an arrestee's person, on his clothing, [or] any area within his immediate control, may be searched by law enforcement, *with or without* any reason to suspect that the person is armed or carrying contraband.").

Accordingly, the court concludes that the search of the wallet found on Gordon's person during his arrest was a valid warrantless search. The court thus DENIES the Motion to Suppress the Hawaiian Airlines boarding pass recovered from Gordon's wallet.

## D.      Application to Gordon's Cellular Telephone

Lastly, Gordon seeks to suppress evidence of the call logs and contact list taken from his cellular telephone, arguing that its search violated the Fourth Amendment.[8] The court disagrees, and concludes that the warrantless search was

---

[7](...continued)
Indeed, in distinguishing a purse found in a vehicle from a wallet found on a person, *Monclavo-Cruz* also suggested that (under *Edwards*) if the purse had been part of the arrestee's "person" -- as the parties here stipulated was the case with Gordon's wallet -- then the search of the purse would "probably be legal." 662 F.2d at 1289.

[8]  Motion to Suppress No.1 and Motion to Suppress No. 2, Doc. Nos. 74 & 75, both challenge the search of Gordon's cellular telephone.

reasonable and falls squarely within the search-incident-to-arrest-exception.

Initially, the cellular telephone was taken from Gordon's person, contemporaneously with his detention and arrest. Agent Sze and others testified credibly that the phone was given to Agent Sze while Gordon was being patted down. Agent Sze "right then and there" viewed the telephone's recent call list and contact information, seeking evidence (checking whether Gordon "was supposed to meet with somebody right away" or "who else was calling him" who might be involved). At some point, the telephone rang and was "chirping."

Having been taken from Gordon's person, Agent Sze was authorized to search the telephone. *See, e.g.*, *Davis*, 131 S. Ct. at 2424; *Robinson*, 414 U.S. at 224; *Ruckes*, 586 F.3d at 717. Just as a wallet taken from a person may be searched incident to arrest, so may a cellular telephone. *See, e.g.*, *United States v. Finley*, 477 F.3d 250, 259-260 (5th Cir. 2007) (upholding search for text messages and call records of cell phone found on suspect's person, reasoning that "[p]olice officers are not constrained to search only for weapons or instruments of escape on the arrestee's person; they may also, without any additional justification, look for evidence of the arrestee's crime on his person in order to preserve it for use at trial"); *United States v. Ortiz*, 84 F.3d 977, 984 (7th Cir. 1996); *Murphy*, 552 F.3d at 411; *United States v. Hill*, 2011 WL 90130, at *7 (N.D. Cal. Jan. 10, 2011);

*Gomez*, 807 F. Supp. 2d at 1143; *United States v. Slaton*, 2012 WL 2374241, at *8 (E.D. Ky. June 22, 2012).

Moreover, even if the telephone cannot be considered as part of Gordon's "person," it was immediately and contemporaneously searched while Gordon was being detained and arrested.[9] Thus, like the search of Gordon's black bag, the search by law enforcement is valid when analyzing the circumstances under *Maddox* and applying the twin "*Chimel* factors."

Gordon's cellular telephone was within his "immediate control" when he was arrested, and no events occurred "after the arrest but before the search" that made the search unreasonable. *Maddox*, 614 F.3d at 1048. Agent Sze made a contemporaneous initial search at the scene, with nothing intervening between the arrest and the search. Gordon's arrest and the initial search of the telephone occurred in "one continuous series of events closely connected in time." *Smith*, 389 F.3d at 951 (quoting *McLaughlin*, 170 F.3d at 893). And where Gordon's arrest followed "quickly on the heals" of the search of the telephone (or vice versa), the precise order "is not particularly important." *Id.* (quoting *Rawlings*, 448 U.S. at 111).

---

[9] This fact distinguishes this case from *United States v. Lasalle*, 2007 WL 1390820, at *7 (D. Haw. May 9, 2007), where the search of a cellular telephone was suppressed because it was not "roughly contemporaneous" with the suspect's arrest.

Additionally, the search is valid viewed in light of the twin justifications in *Chimel.* Here, even assuming that a handcuffed Gordon could not have reached for the telephone (to, for example, delete its contents), the nature of a cellular telephone justifies a search under *Chimel*'s preservation of evidence factor. *See Murphy*, 552 F.3d at 411 ("[T]he need for the preservation of evidence justifies the retrieval of call records and text messages from a cell phone or pager without a warrant during a search incident to arrest."); *United States v. Davis*, 787 F. Supp. 2d 1165, 1171 (D. Or. 2011) ("Drug-trafficking circumstances can also justify the warrantless search of a cellphone because recent call records can be easily destroyed, and cell phones provide the means for drug smugglers to coordinate efforts that could endanger officers and the public."); *cf. United States v. Flores-Lopez*, 670 F.3d 803, 808 (7th Cir. 2012) ("Other conspirators were involved in the distribution of methamphetamine besides . . . the defendant, and conceivably could have learned of the arrests . . . and wiped the cell phones remotely before the government could obtain and execute a warrant and conduct a search pursuant to it.").

Finally, as with the black bag, the telephone remained in custody of law enforcement after being taken from Gordon's person and searched at the scene, and then searched again at the Federal Building. Because the initial search was

valid, the secondary search was also valid.  *See Burnette*, 698 F.2d at 1049 ("[W]e

hold that once an item in an individual's possession has been lawfully seized and

searched, subsequent searches of that item, so long as it remains in the legitimate

uninterrupted possession of the police, may be conducted without a warrant.").

The court recognizes that this is an emerging area of criminal law,

given the computer-like capacity of modern "smart phones."  *See, e.g.*,

*Flores-Lopez*, 670 F.3d at 804 ("Lurking behind this issue is the question whether

and when a laptop or desktop computer, tablet, or other type of computer (whether

called a 'computer' or not) can be searched without a warrant -- for a modern cell

phone *is* a computer.").  Gordon likens searches of modern cellular telephones to

searches of computer hard drives or electronic storage media.  *See United States v.*

*Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1178-80 (9th Cir. 2010) (en

banc) (Kozinski, C.J., concurring) (providing guidance about how to deal with

searches of electronically stored data).

The court, however, need not reach these emerging issues here.

Rather, under the particular facts of this case -- where Gordon's telephone was

taken from his person, and was searched contemporaneously -- the search fits

squarely within current search-incident-to-arrest principles.  And importantly, the

only evidence taken from Gordon's cellular telephone (snapshots of its call history

and its contact list) are not characteristics of a computer-like smart phone. That is, although *some* modern cellular telephones may be considered computers, there is no indication that *Gordon*'s telephone had such characteristics, or that an extensive computer-like search was conducted. *See Flores-Lopez*, 670 F.3d at 810 (observing that searches of modern smart phones may present issues similar to computer searches, but upholding a search of a phone only for its telephone number, reasoning that "[w]e need not consider what level of risk to personal safety or to the preservation of evidence would be necessary to justify a more extensive search of a cell phone without a warrant"); *Gomez*, 807 F. Supp. 2d at 1149 ("In the case of a cell or smartphone. . . . a search contemporaneous with an arrest would not possibly allow a law enforcement officer at the scene of an arrest from downloading the entire content of the phone's memory. It would not allow much more than what occurred here -- a short, limited perusal of only recent calls to quickly determine if any incriminating evidence relevant to this drug crime can be identified.").

In short, Gordon's Motions to Suppress information taken from his cellular telephone are DENIED.

## IV.  <u>CONCLUSION</u>

The court upholds the searches of Gordon's black bag, wallet, and cellular telephone.  The searches were reasonable and fit squarely within the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement.  Gordon's Motion to Suppress No. 1, Doc. No. 74, and Motion to Suppress No. 2, Doc. No. 75, are DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, September 10, 2012.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge